Number 25-1428 and 1462 and 1463, Gary Flowers et al. v. Flywheel Energy Production et al., etc. Mr. Crowder, when you're ready. Good morning, your honors. Good morning. May it please the court, I've reserved two minutes for a rebuttal. You'll have to protect it yourself. And I will. My name is Will Crowder and I represent the appellants in the Flowers, Eubanks, and Olinger appeals. In Arkansas, if there is a drilling unit that includes an unleased mineral interest, Arkansas Code Annotated 1572-305 allows the operator, the marketing party, to take those deductions from the royalty payments owed to those landowners allowed by the lease from the first one-eighth of the royalty owner's monthly royalty payments. In a drilling unit, consider this podium as a drilling unit. You may have some operators, you may have some royalty owners who have leases that allow post-production costs to be deducted from the royalty owner's monthly payments. And in a drilling unit, you may have some leases, like our client's leases, that do not allow post-production costs to be deducted from their royalty payments. The Arkansas Court of Appeals in the Flywheel v. Arkansas Oil and Gas Commission considered the entire language and text of 17-3305 and considered the Arkansas Supreme Court precedent, all the precedent that was considered by the district court in making its decision, which holds that if a lease says proceeds, it prohibits post-production royalty deductions. So the Arkansas Court of Appeals decision in Flywheel v. Arkansas Oil and Gas Commission is on all fours with our case because it involved the same business practices, the same language, and the same statute, and the same relevant parts, and the same Arkansas case law which the district court, in making its eerie guess, said the Arkansas Supreme Court would make a different decision. And finally, it involved the same party, Flywheel. And I want to use sort of an example. Let's say you have a rich man who owns 640 acres. He owns the entire drilling unit, and he has a gross proceeds lease. He should be paid gross proceeds under his lease because he has a lease that says, I get paid 20% of the proceeds in gross. But imagine that same drilling unit, 640 acres, but grandma has one acre that's unleased. According to their reading of the statute, that grandma's one unleased acre transforms the entire drilling unit into a net proceeds unit for that first one acre. That's an absurd result. If a lease, the Flywheel says that if your statute, the statute says net proceeds in A3, that only means net of any post-production expenses your lease allows. That's the sensible way of reading it. It doesn't transform a lease into a net proceeds lease. It just simply allows deductions based on whatever deduction. It's net of whatever deductions your lease allows. If you have a lease that permits deductions for post-production expenses, then for the first one acre, your entire royalty proceeds and the excess royalty is paid in net of post-production expenses. That complies with the statute. That complies with your contract. If you're a royalty owner, like the royalty owners in our appeal, when your lease doesn't allow productions for post-production expenses, your first one acre and the excess royalty get paid in gross because your lease does not allow post-production expenses to get deducted. The Arkansas Court of Appeals didn't create a ham-fisted solution to this. They created an elegant, simple, and uncomplicated solution to construing 72-305 to the issues in this appeal and to make sense of the fact that you have different landowners with different types of leases. Flywheel's reading of the statute would make a gross proceeds lease, a true gross proceeds lease, impossible to have. And I believe that if Judge Rudofsky were here, he would say, you know, we know that the Arkansas Supreme Court is the master of its law. It is not true that the Arkansas Intermediate Court of Appeals is the master of Arkansas law. Instead, one would look at the statute itself, and you would see if the statute, applying a strict textualist analysis, creates an ambiguity. And Judge Rudofsky tells us there is no ambiguity and that the statute does in fact create one-eighth royalty statutory lease provision. Well, under West v. American Telephone and Telegraph, a federal court must follow intermediate state court rulings unless there is some persuasive data that suggests that otherwise. The Arkansas Court of Appeals is an intermediate state court ruling, so that falls under the rule of West v. American Telephone and Telegraph. And the Arkansas Supreme Court's denial of the appeal in Flywheel v. Arkansas Oil and Gas Commission is the ultimate data point. What case stands for that, that the denial of the review can be the ultimate point for an Erie analysis? I mean, maybe it's out there. I'm just not familiar with it. Well, it is a clear data point. It's not the ultimate. In my opinion, it's the ultimate data point. Have we considered that before as part of our Erie analysis, that a Supreme Court denied review? I can't think of a case where that's happened, Your Honor. But the default rule is that you have to look for persuasive data otherwise, and the persuasive data is the rulings of the state courts. So if there was a persuasive Arkansas Court of Appeals case, that is a part of the case, that the Arkansas Supreme Court let that stand. And so the way the law stands right now, Your Honor, is that net proceeds under A3 has two different meanings. The same language has two different meanings, whether you are an integrated leaseholder versus whether you have a negotiated arms-linked lease. Those two people will get paid separate amounts of money. And in fact, the person that negotiated the lease for gross proceeds gets paid less on their first one-eighth than the person who didn't negotiate and was integrated. And that's an absurd result. And so I think the court needs to consider that it's an absurd result, which is a data point. It's an absurd result to follow the Arkansas Court of Appeals for integrated leases considering the same language and not follow that same language when it comes to people who have gross proceeds leases with our clients. The statute uses the identical term net proceeds for both leased and unleased interest. Under the principle of consistent usage, those words have to have the same meaning within the unit. And I want to speak to the act that came after this appeal, which is 102-4. First of all, we've argued that Flywheel never had a vested right to seize these loyalties. And a court, in construing a statute, any statute, has to avoid constitutional problems with the statute. So Act 102-4 should be framed really as a clarification of the ambiguity which has been found in the statute. Not a change in the statute. In fact, Judge Marshall, in his preliminary injunction against Act 102-4, he found that the statute was murky and the net proceeds were ambiguous. And the simplest solution is that Act 102-4 simply cleared the water by codifying the Arkansas Oil and Gas Commission's approach to all leases. That's the simplest way to solve this, is that net proceeds means what the Arkansas Court of Appeals means, Act 102-4 clarified what the act always meant, and that net proceeds means net of whatever deductions are allowed by the terms of your lease. I mean, the statute, I mean, it is what it is, but basically it says net proceeds means gross proceeds. Is that being unfair? No. Net proceeds means net of whatever your lease allows. Well, here I'm reading the statute here. If a mineral interest within a drilling unit is covered by an executed lease, the gross proceeds, and that's the definition of net proceeds, right? Now, are you reading the amended Act? In section 1572-325. I mean, the way I read the Act is simply changing the interpretation, right? We're redefining net proceeds, and what it now means going forward, not retroactively, is gross proceeds. And that's within the purview of the legislature. That's not an issue. I'll point out two things, Judge. One is that case is on appeal. And the Arkansas Attorney General's Office has taken that case on appeal. And the energy owners are defendants in that appeal. So the court will, at some point, be able to say whether that acted as a substantive change in the law or whether it just clarified the law. My point is that the law didn't need to be changed because if you read the entire text of the law, it requires a pool to be created for a drilling unit. While the owner's paycheck is paid pursuant to the terms of their lease. And that's in A2. The Savings Clause bolsters that because it protects any contractual obligations in excess of the floor, which is set by the statute. So the statute sets a floor. You can contract for more than the floor. And the deductions you're allowed to take under the word net in that statute are whatever deductions are allowed by your lease. And I think it's important that Hannah has said, look at the course of dealing of the parties in determining how this lease should be interpreted. And the course of dealing from these parties is they were paid gross proceeds for years. And then suddenly their checks started coming in and they were less. And they complained to everybody who would listen. And that's the most unfair result that there is. And they justify it based on Wisenhunt. And just to briefly touch on Wisenhunt. Wisenhunt was an unpublished federal case. It didn't consider the full language of 305. And it's not controlling. So Flywheel came up with this interpretation of 305. A land man showed up to their door and said, we're going to give you a 20% gross proceeds lease. And the person taking the lease says, that sounds great. I'll sign it. Because the guy that just came in said he was going to offer me a net lease. So it creates a perverse incentive for land man and oil companies to induce people to sign leases that they never intend to honor. And that's really the policy reason behind that. I see I'm over my time, so I'll reserve the rest. Thank you. Thank you. Mr. Stoball, when you're ready. Not enough play there, unfortunately. Your Honors, may it please the Court, I'm Forrest Stoball, representing Appley Flywheel Energy Production, LLC, and arguing on behalf of Flywheel and the other Appleys. Your Honors, despite appellants' ever-escalating attempts to muddy the waters, the consolidated cases before you are very simple and straightforward matters of statutory interpretation. Specifically, these cases boil down to, what royalty deductions are energy companies required to take, pursuant to Arkansas Code Annotated Section 1572.305? And the District Court interpreted the statute, it conducted a thorough review, and it granted summary judgment in Appley's favors, holding that energy companies are required to deduct post-production expenses from the first one-eighth of natural gas royalties. Now, Your Honors, before I get into my substantive points, I just want to jump to some things that have been said about a course of dealing. Now, Your Honors, first off, the course of dealing is not 30 years. It's 15 years at most. But that's neither here nor there because this is a statutory interpretation case, not a contracts case. The ultimate goal of statutory interpretation is to give effect to the intent of the legislature. What parties to a contract understood a statute to mean is neither here nor there. It has nothing to do with what the legislature intended. The fact that parties failed to appreciate the meaning, didn't understand it, or were just unaware of it. Well, now we have a revised statute. What does that have to say about what the legislature intended? Well, I think it has everything to do with what Your Honor just said in questioning Mr. Crowder, and that's it calls itself a clarification, but it looks like an amendment. It's redefined a material term. But you raised the legislative intent, and to the extent that, you know, doesn't the revision reflect legislative intent? In other words, it may be a response to this case. I don't know. No, that's not what we meant by that. Your Honor, I think it can reflect the intent of the legislature at the time of the clarification or the amendment. And to be clear, the title of the act says both, an amendment and a clarification. It can reflect the intent at the time it was enacted, and that's reflective of Arkansas case law in cases like Peterson, Produce, Covey, Cheney, which basically hold that an amendment cannot affect the meaning a statute had or the intent of the legislature had at the time it was enacted. And I would argue that the best evidence of the legislature's intent of a 40-year-old statute are the words on the page that it put there 40 years ago, not something that's come about in later times as a result of new developments. So, Your Honors, as far as Act 1024 is concerned, it is preliminarily enjoined. You know, another court has looked at it. They've said this appears to be a contract clause violation. And looking at the law, I would decide the same way that Judge Rudofsky has here. So, Act 1024 is just not the best evidence to base anything on this case. It has nothing to do with this case. It has to do with things moving forward. A retroactive application is going to be unconstitutional. And, Your Honors, circling back to the AOGC case, I believe it was Judge Smith who asked, is this distinguishable or is it just wrong? And number one, I think it is distinguishable. That is a basis that Your Honors could go down, right? This is a case dealing with those force-pulled interests. And that's referenced no less than 35 times in the opinion. So, it is factually distinguishable. What did the district court, did it, what's a fair characterization of what the district court found here? Was it wrong or distinguishable? The district court found that it was wrong. Well, I'll back up on that. It found that it was not the best evidence on which to predicate its eerie guess. And I think that's the actual question here and the proper way to frame this. But part of that, I think the district court concluded it was wrong. I would agree with that, Your Honor. And to go along the lines of Judge Smith's earlier question, you know, I think the question was posed to the effect of, that's escaping me right now, but I'll pivot. And it's wrong, oh, I recall now. He asked if this issue was to come up in state court, what would happen, right? Could the Court of Appeals, what would it do if it went all the way up through the process again? Court of Appeals decisions are not binding on each other. They could very easily overrule this opinion for the reasons that Judge Rudofsky has set out in his own reconsideration order. And I think those are valid reasons to overrule the opinion. The, you know, lip service to Myers is there, but there's no follow through. They found the course of dealing compelling. That's in the opinion. And as we've just went through, that's simply not a proper canon of statutory interpretation. They completely ignored the at the mouth of the well language. And I think if you grapple with that, at the mouth of the well versus proceeds, you'll see that the post-production expenses have to be allowed when that's considered. And there's also the fact that we would just have a basic refusal to engage with Hanna, Bushmeyer, Parnell, Wisenhunt. The court says nothing in these cases stand for the proposition that post-production expenses can be deducted. But to borrow from the rules of evidence, those cases aren't being cited for the truth of the matter asserted, so to speak. They're being cited for their context in providing us with these definitions of net and out the mouth of the well. So, no, they're not going to say on their face, and the deductions can be taken. But they do tell us that when a party says net in the oil and gas context, like in Hanna, there's a clear intent for the parties to deduct some kind of expense, like the compression costs that were at issue in Hanna. And when we look at Parnell and Bushmeyer, when we have at the mouth of the well language, the same kind of language that has been looked at by other circuits, the Fifth Circuit and the Connie Woods case by Justice Wisdom, a case that was cited approvingly by this court in Sandral v. Lake Plastic Oil, that when we have that clear unassailable definition of that term, that we can deduct the post-production expenses. And, Your Honors, turning back to the language of the statute, it says net. And I think we all understand what net means. Net means net. Net means net profits minus expenses. And when we look at, you know, the statute says, the net proceeds from the sale thereof shall be distributed to the owners of leasehold royalty, meaning folks like the plaintiffs or the appellants. We also have the section that says when the folks who are the working interest owners and the operators are remitting their funds for the blended royalty scheme. Would you address counsel's argument that this results in an absurd situation where the example was given of the grandmother owning a small portion of the unit? Why is that not correct? Now, it may not be determinative in your view, but are the results here as they were described by your friend on the other side? I don't know that the results are absurd. There was a reason the legislature enacted this statute. It's a little outside our textualist arguments, but the reason that they were enacted was that, and to be clear, Your Honors, the only legislative history coming in to this record is coming in through Flywheel in the Heard case. And it's that there was a problem. Folks were marketing their gas differently. Folks that were put into the same unit were receiving very disparate royalties because their particular lessee was doing a better job of marketing its gas. So this blended weighted royalty scheme where we throw the first one-eighth into a pot and give it out equally, that was made to address that problem. Was it made to address that problem, or was it made to address the problem where you had unleased interests, right? And so if you're looking at it, you know, I walk in, I make a lease for 2,000 acres. Whatever the development is, it's encompassed within my land. Am I bound by this one-eighth interest? Your Honor, I think that everyone is bound by the statute. It's a statute. It's going to trump the particulars of anyone's individual oil and gas lease being a creature of statute. Notwithstanding the provision that says nothing in this is supposed to impact a lease? Well, Your Honor, I think Your Honor is referring to Section A-2. In Section A-2, that goes to creating the legal fiction that is a drilling unit, and the district court addressed this in its opinions. Okay, go ahead. What I was getting to, Your Honor, is it's about paying out folks when we drill these laterals, and there's not actually a well under their property. We're going to pay you out because you're leased and you're part of this drilling unit. It doesn't foreclose the statutory royalty scheme that goes on in Section A-3. And that was plain all along, in your opinion? Yes, Your Honor. All right. And so what you really have is the problem was just to create a uniform lease provision for everybody on the unit as opposed to how do we fix the problem for people who just have never entered into a lease, right? Because I can tell you that in North Dakota, that's usually been the objection and the problem. It's like the guy who doesn't have a lease is getting his oil taken from him. Correct. And so there is a, within the unit development, there's a statutory provision for payment. It doesn't necessarily affect everybody else. Everybody else is just getting what their lease says. Well, I think everybody's getting what the statute requires them to get in this case. True enough, because the statute just makes plain that if you've got a lease, it trumps the statutory royalty. Section 6A says very clearly. And so it's the ambiguity in this particular case that the statutory lease provision is, in your opinion, there is no ambiguity, right? There is no ambiguity, Your Honor. So that's the answer is that the legislature is free to create a statutory lease on everything, and they did. Correct. Thank you. Your Honors, I have some co-appellants that would like to get up here and argue. I'll cede the rest of my time to them. I'm sorry. I didn't mean to filibuster you. And Ms. Tiblitz, I'll give you three minutes since I took your time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Elizabeth Tiblitz on behalf of Appelier XTO Energy. XTO agrees with Flywheel's interpretation of the statute. I will not go into all of the same arguments that the Court has already covered. I do want to just briefly highlight a couple of unique issues with respect to the claims against XTO in the record on XTO's motion for summary judgment. First, I do want to emphasize the question of custom and usage and how people have acted under the statute over the last 30 years has become the focus of some of the Court's questions. I do want to emphasize there is no evidence in the summary judgment record with respect to XTO's custom and practice and what, if anything, XTO did under the statute during the time. That is all pertinent to Flywheel alone. I also want to note that with respect to the Flywheel-Arkansas Oil and Gas Commission case, as the Court knows, that particular decision focused very heavily on the extrinsic evidence specific to Flywheel. XTO was not a party to that action, was not a party to that appeal. None of that evidence, the extrinsic evidence that was discussed, pertains to XTO. Additionally, I do want to focus on the specific provisions of the Eubanks Oil and Gas Lease. The Eubanks Oil and Gas Lease specifically refers to the statutes in effect at the time the Eubanks signed the lease. That includes the statute that we have all been discussing today at length. The lease specifically states that to the extent the statute conflicts with the terms of the oil and gas lease, then the obligations under the oil and gas lease are suspended and the lessee cannot be liable for any damages there under. So, I respectfully submit that in addition to signing the lease with full knowledge imputed, knowledge of the statute in effect at the time they, in fact, signed the lease, the Eubanks expressly agreed that their lease would incorporate the statute in effect at the time. There's been a lot of discussion of what net proceeds means. I want to point out for the Court that Appellant has not offered any interpretation of net versus gross. They have not explained what under the word net can, in fact, be subtracted from proceeds. As noted in XTO's brief, all of the case law from other jurisdictions is consistent with HANA, and that means that post-production costs can be deducted from the costs required from the proceeds that are ultimately obtained at the sale. With respect to Plaintiff's Appellant's ADTPA claim, I will note that XTO pointed out that they did not submit any evidence regarding two elements of that claim. When they responded to XTO's motion for summary judgment, plaintiffs did not provide any evidence, nor did they address XTO's argument. For the foregoing reasons, XTO respectfully requests that the Court affirm the District Court's summary judgment on behalf of XTO. Thank you. Thank you, Your Honors. Mr. Crowder? Thank you, Your Honor. Section A-2 of the statute requires payment of royalties in conformance with the terms of the lease. That's the plain language of that statute. The fact that Judge Rudowsky or the District Court denied our claims for Arkansas Conceptual Trade Practices was because he found there was no unlawful practice, that Flywheel was entitled, in fact, to take those deductions, and so there was no bait and switch. What we're asking the Court to do is to find that the statute did not allow these deductions, and so it's a bait and switch. It's that simple. I had a question about the new statute. And the net proceeds, as defined by the new statute, means net proceeds which the lease allows. And there are leases which allow net deductions for transportation, compression, dehydration, all types of costs. So there is a limit on the types of net costs that can be deducted. And those are post-production costs which are identified by a lease. That's the simplest way to do it. And finally, I'd just note that the statute creates a pool, okay, for everyone to get paid a baseline, but the pool does not establish what the people get paid out of the pool. If that were the case, then I see my time is up, Your Honor, and I appreciate the Court's time. Thank you. Thank you, Your Honor. The case is submitted. I want to let the parties know we appreciate their argument and their briefing. It's been very helpful, and we'll try and get an opinion out as soon as possible. Thank you very much. Thank you, Your Honor.